**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
JOHN A. PETRUCELLI,                       )
                                          )
                    Plaintiff,            )
                                          )
          v.                              )          Civil Action No. 11-1780 (RBW)
                                          )
DEPARTMENT OF JUSTICE,                    )
                                          )
                    Defendant.            )
_____  )


## MEMORANDUM OPINION AND ORDER

        This matter came before the Court on the Defendant's Renewed Motion to Dismiss or,

Alternatively, Motion for Summary Judgment.  ECF Nos. 40-41.[1]  On March 31, 2014, the Court

granted the defendant's motion in part and denied it in part without prejudice.[2]  This

Memorandum Opinion sets forth the reasons for the decision.

## I.  BACKGROUND

        The plaintiff, a federal prisoner, brings this action under the Freedom of Information Act

("FOIA"), *see* 5 U.S.C. § 552 (2006), against the United States Department of Justice ("DOJ"),

---

[1]  Further references to the defendant's renewed motion or supporting memorandum of points
and authorities are references to the Errata to Defendant's Renewed Motion to Dismiss or,
Alternatively, Motion for Summary Judgment.  ECF No. 44.  References to the defendant's
exhibits are to those items submitted with its initial renewed motion. ECF Nos. 40-41.

[2]  The March 31, 2014 Order also denied the plaintiff's Motion for Judicial Notice, ECF No. 43,
his Motion Pursuant to Rule 18 and/or 20(a) of the Federal Rules of Civil Procedure, ECF No.
46, and Plaintiff's Motion to File Sur-reply, ECF No. 69.

demanding the release of records maintained by the Federal Bureau of Prisons ("BOP"), the

Executive Office for United States Attorneys ("EOUSA"), and the Federal Bureau of

Investigation ("FBI"), and also against the BOP under the Privacy Act, *see* 5 U.S.C. § 552a

(2006). It appears that the information of interest to the plaintiff pertains to the date of his arrest

and his eligibility for the death penalty. *See* Complaint for Injunctive Relief and Monetary

Damages in Excess of $10,000, ECF No. 1 ("Compl.") ¶¶ 5-6, 11; Plaintiff['s] Second Amended

Complaint for Injunctive Relief and Monetary Damages in Excess of $10,000, ECF No. 10

("Am. Compl.") ¶¶ 5-6.

### A. The Plaintiff's Criminal History

The plaintiff's criminal history has been summarized as follows:

> Throughout the early 1990s, John Petrucelli was a member of the Tanglewood Boys, a violent gang that regularly engaged in murder, armed robbery, burglary, loan sharking, and bookmaking in the Bronx and Westchester County[, New York]. The Tanglewood Boys' membership was comprised chiefly of young men who wished to become members of the Luchese Organized Crime Family.

> In the early morning of June 20, 1995, Tanglewood Boy member Darin Mazzarella was shot by Michael Zanfardino, an associate of the rival Genovese Family. Petrucelli witnessed the shooting. A few hours later, near P.S. 108 in the Bronx, Petrucelli stabbed Paul Cicero, a cousin of a Genovese Family associate, to avenge the shooting of Mazzarella. Sean McKernan, a childhood acquaintance of both Petrucelli and Cicero, saw Petrucelli lunge at Cicero from his position seated on a stoop near P.S. 108, but he did not observe the stabbing because a concrete wall blocked the lower three-quarters of Petrucelli's and Cicero's bodies. After Petrucelli left the scene, Cicero passed in front of the stoop where McKernan was sitting and said, "That bastard Johnny just stabbed me" while clutching his stomach. Cicero subsequently bled to death on the operating table at a nearby hospital.

> On June 21, 1995, the day after the shooting and stabbing, Steven Crea, the Underboss of the Luchese Family, summoned

Petrucelli to a meeting. Crea explained that the Genovese Family had contacted him to prevent the Tanglewood Boys from taking revenge against Zanfardino. Petrucelli informed Crea that he had stabbed Cicero in response to Mazzarella's shooting. Petrucelli then fled to Las Vegas, where he stayed with his grandmother, and later his aunt and uncle, for several weeks.

A few days later, Acting Boss of the Genovese Family, Liborio Bellomo, requested a meeting with Joseph Defede, the Acting Boss of the Luchese Family, to discuss the circumstances surrounding the shooting and stabbing. Bellomo asked Defede to ensure that the Tanglewood Boys not to [sic] pursue Zanfardino and argued that the Cicero murder constituted sufficient revenge against the Genovese Family for Mazzarella's shooting. Defede granted Bellomo's request.

In early 1996, after Mazzarella had recovered from his gunshot wounds, he met with Defede to discuss his desire to retaliate against Zanfardino. Defede explained that revenge would be unjustified because of Cicero's murder and instructed Mazzarella not to exact retribution. Several days later, at Defede's request, Mazzarella and Zanfardino met and formally called a truce.

*Petrucelli v. United States*, No. 05-cv-9582, 2009 WL 4858081, at *1-2 (S.D.N.Y. Dec. 15, 2009). "The original indictment against [the] plaintiff resulted from a long FBI investigation into [the] plaintiff['s] . . . organized crime activities." Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss or, Alternatively, Motion for Summary Judgment, ECF No. 23 ("Def.'s First Mem."), Declaration of David M. Hardy ("Hardy Decl.") ¶ 5. Ultimately, the plaintiff was charged with and convicted of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1), and is serving a term of life imprisonment. Hardy Decl. ¶ 5; *see United States v. Petrucelli*, 97 F. App'x 355 (2d Cir. 2004) (affirming conviction on direct appeal).

The plaintiff alleges that "[o]n January 28, 2002[, he] was arrested by F.B.I. Agents Orango and Munger," Am. Compl. ¶ 10, with the assistance of "a fully armed F.B.I. Swat team,"

*id.* ¶ 11.  He further alleges that he "was photographed and fingerprinted by F.B.I. Agents while being held in the White Plains headquarters" office, *id.* ¶ 13, after which he "was transported by . . . Agents Orango and Munger to [the BOP's Metropolitan Detention Center in Brooklyn, New York (MDC Brooklyn)] at about 5:00 PM" on that same date.  *Id.* ¶ 15.  These agents, the plaintiff alleges, transported him from MDC Brooklyn "to his arraignment at [the] Manhattan Federal Court" on February 1, 2002.  *Id.* ¶ 16.  The plaintiff apparently believes that responsive records showing an "original arrest date of January 28, 20[0]2, and favorable evidence . . . could exculpate [him] from unlawful confinement."  Affidavit of Facts in Support of []Notice[] of Missing Facts of Evidence, ECF No. 27 ¶ 4.

### B.  The Plaintiff's Request for Amendment of BOP Records

Through the BOP's administrative remedy procedure, *see* Def.'s First Mem., Declaration of Donna Johnson, ECF No. 23-2 ("Johnson Decl.") ¶¶ 9-10, on September 11, 2011, the plaintiff submitted the following request to the Warden of the Federal Correctional Institution in Manchester, Kentucky:

> I am writing in reference to my record date of arrest and arrival to
> [the] BOP . . . as being incorrect.  "1/31/02"  I ask . . . that my
> arrest date and arrival to M.D.C. Brooklyn reflect the correct date
> of Jan. 28[,] 2002 . . . .  I . . . ask for my records to be amended
> showing [my] actual arrest, incarceration at M.D.C. Brooklyn
> being Jan. 28, 2002.

Johnson Decl., Ex. B (Request for Administrative Remedy dated September 11, 2011).  After having reviewed "the U.S. Marshals Report, Presentence Investigation Report (PSR), Prisoner Remand Form, and the SENTRY data base," and after having made "contact with the FBI's field office in the Southern District of New York," the Acting Warden informed the plaintiff that his "date of arrest in Yonkers, New York, and subsequent delivery to MDC Brooklyn [was] January

31, 2002." *Id.*, Ex. B (Request for Administrative Remedy, Remedy ID # 656846-F1, Part B –

Response from R.D. Ranum, Acting Warden, dated October 4, 2011).  He further stated that

"[t]here [was] no documentation which indicates an earlier date of arrest."  Johnson Decl. ¶ 12.

The plaintiff's administrative appeal to the BOP's Mid-Atlantic Regional Office of the denial to

amend his BOP records was subsequently denied.  *Id.*; *see id.*, Ex. B (Regional Administrative

Remedy Appeal, Part B – Response from C. Eichenlaub, Regional Director, Mid-Atlantic

Region, BOP, dated November 22, 2011).

### C. The Plaintiff's Requests for BOP Records

#### 1. FOIA/PA Request Number 2010-07999

In the plaintiff's first FOIA request to the BOP, he sought the following:

> (1) any and all records, reports, files, memos and materials to include electronic filings that contain any information concerning my initial intake screening on January 28, 2002 at [MDC Brooklyn];
>
> (2) a copy of the log book on January 28, 2002 at [MDC Brooklyn] when I was delivered into their custody;
>
> (3) Copy of the warrant being executed for my arrest and delivery to [MDC Brooklyn];
>
> (4) Copy of fingerprint card taken during intake screening and other data taken by . . . MDC officials or staff upon my intake and processing; [and]
>
> (5) copy of medical information taken by medical staff at [MDC Brooklyn] during my medical screening on January 28, 2002[.]

Johnson Decl., Ex. C (Freedom of Information Act and Privacy Act request dated March 12,

2010) at 1.  Because the plaintiff was incarcerated at the United States Penitentiary in Canaan,

Pennsylvania ("USP Canaan") at the time of this request, its Legal Services Department staff and

the Secretary of the plaintiff's Unit Team searched for medical and other records responsive to the request, which had been assigned FOIA Request Number 2010-07999.  *See id.*, Ex. D-E (email messages dated May 20, 2010 and May 24, 2010, respectively).  Of 56 pages of records deemed responsive to the request, the BOP released 55 pages in full and withheld one page in full under FOIA Exemption 7(F).  *Id.* ¶¶ 20-21; *see id.*, Ex. F (Letter to the plaintiff from Henry J. Sadowski, Regional Counsel, Northeast Regional Office, BOP, dated September 21, 2010).

The plaintiff pursued an administrative appeal to the DOJ's Office of Information Policy ("OIP"), *id.* ¶ 46, which remanded the matter to the BOP, *id.* ¶ 49.  At the time the BOP's declarant executed her declaration following the remand, the agency had not yet completed the re-processing of the records.  *Id.* ¶ 52.  The BOP thereafter reviewed 22 pages of records, 18 of which were released in full and three of which were released in redacted form after information was deleted pursuant to FOIA Exemptions 6, 7(C), ad 7(F).  Defendant's Reply in Support of Motion to Dismiss or, Alternatively, Motion for Summary Judgment, ECF No. 31, Ex. 8 (Letter to the plaintiff from Michael D. Tafelski, Regional Counsel, Northeast Regional Office, BOP, dated October 4, 2012).

### 2.  FOIA/PA Request Number 2010-08695

The plaintiff's second FOIA request to the BOP sought "a record of a telephone call placed on Jan[uary] 28, 2002 to phone number #914-345-2815."  Johnson Decl., Ex. G (Freedom of Information Act and Privacy Act request dated March 16, 2010).  It was "determined that [the plaintiff] was not in BOP custody on January 28, 2002, the date of the call he requested."  *Id.* ¶ 24.  For this reason, the BOP's declarant "concluded that there were no records responsive to [the] request," and the plaintiff was so notified.  *Id.*; *see id.*, Ex. H (Letter to the plaintiff from

Henry J. Sadowski dated June 8, 2010).  The OIP affirmed this determination in response to the

plaintiff's administrative appeal.  *Id.* ¶¶ 53-54; *see id.* Ex. CC (Letter to the plaintiff from Anne

D. Work, Senior Counsel, Administrative Appeals Staff, OIP, dated May 18, 2011).

### 3. FOIA/PA Request Number 2010-09077

The plaintiff's third FOIA request to the BOP sought:

> (1) Any and all records, reports, files, memos, and materials to
> include electronic filings that contain any information concerning
> my Death Penalty Status.
>
> (2) "Notice" That the Gov't believes that circumstances are
> justified for a sentence of death.
>
> (3) Any known aggravating factors that [the] government, if the
> defendant is convicted, proposed to prove.
>
> (4) Any substantive motion or activity connected to Death Penalty.
>
> (5) Any mitigation memorandum submitted by counsel . . . .

*Id.*, Ex. I (Freedom of Information Act and Privacy Act request dated March 22, 2010) at 1.

Staff at USP Canaan located one responsive record, *id.* ¶ 28, and that document was withheld in

its entirety under Exemption 5, *id.* ¶ 29.  The plaintiff was notified that the document was being

withheld, *id.*; *see id.*, Ex. K (Letter to plaintiff from Henry J. Sadowski dated July 30, 2010), and

he successfully administratively appealed that determination to the OIP; on remand, the BOP

released the document in its entirety.  *Id.* ¶¶ 57-58.

### 4. FOIA/PA Request Number 2010-10411

The plaintiff's fourth FOIA request to the BOP sought the "detention order[] issued on

Jan[uary] 28 or Jan[uary] 29[,] 2002," which purportedly indicated that the plaintiff was "waiting

on a 'Captain's Review.'" *Id.* ¶ 30; *see id.*, Ex. L (Freedom of Information Act and Privacy Act request dated June 30, 2010). No responsive records were found, *id.* ¶¶ 32-33, and the plaintiff was so informed, *see id.*, Ex. N (Letter to the plaintiff from Henry J. Sadowski dated August 2, 2010). The plaintiff's administrative appeal of this determination was rejected as untimely. *Id.* ¶¶ 59-60; *see id.*, Ex. FF (Letter to the plaintiff from Anne D. Work dated February 23, 2011).

### 5. FOIA/PA Request Number 2011-01572

In his fifth FOIA request to the BOP, the plaintiff sought:

> The compiled file containing the signing in of John A. Petrucelli by FBI Agent or Agents F. Orango and C. Munger to MDC Brooklyn on Jan[uary] 28, 2002 at approximately 6:00 pm. Also the signing out of inmate John A. Petrucelli on Feb[ruary] 1[,] 2002 at approximately 6:30 AM by FBI Agent or Agents F. Orango and C. Munger.

*Id.*, Ex. O (Freedom of Information Act and Privacy Act request dated October 18, 2010). A search of records maintained at MDC Brooklyn yielded nothing responsive to the request. *Id.* ¶ 41. A search of the plaintiff's Central File did yield 15 pages of responsive records, *see id.* ¶¶ 42, 44, and 12 of these pages were released in full, *id.* ¶ 45; *see id.*, Ex. V (Letter to the plaintiff from Michael D. Tafelski dated July 23, 2012) at 1. The three remaining pages were released in part after redacting information under FOIA Exemptions 6, 7(C), and 7(F). *Id.* ¶ 45.

### D. The Plaintiff's Requests for EOUSA Records

### 1. Request Number 03-2265

The plaintiff sought information from the EOUSA, including files, police reports, and videotapes, "believed to be within the possession of the [United States Attorney's Office] for the

Southern District of New York" and "in relation to [his] criminal prosecution in the United States District Court in New York, New York in the criminal case titled and numbered under *United States v. John Petrucelli*, No. 02CR[]099." Def.'s First Mem., Declaration of David Luczynski ("Luczynski Decl."), Ex. A (Freedom of Information Act/Privacy Act Request dated July 1, 2003). The EOUSA denied the request in full, *id.* ¶ 6, relying on FOIA Exemptions 3, 5, 7(A), 7(C), 7(D), and 7(F), *id.*, Ex. C (Letter to the plaintiff from Marie A. O'Rourke, Assistant Director, Freedom of Information/Privacy Act Staff, EOUSA, dated October 30, 2003). In addition, the EOUSA notified the plaintiff that it located approximately 2,112 pages of public records that he could obtain from the Clerk of Court of the Southern District of New York directly. *Id.*, Ex. C at 2.

### 2.  Request Number 04-2972

The plaintiff's second FOIA request to the EOUSA also sought information pertaining to the prosecution of his criminal case. *See id.*, Ex. F (Freedom of Information Act/Privacy Act Request dated June 18, 2004). Specifically, the plaintiff requested:

> Books, Papers, Photographs, Recorded Tapes, Files, Reports, Records, Video Tapes, Police Reports, and Other Documentary Materials or Data, regardless of physical form or characteristic made or received by any officer or employee of your agency relating to, regarding, or naming me.

*Id.*, Ex. F at 1. The plaintiff provided the title and number of the criminal case in the United States District Court for the Southern District of New York, and agreed to pay any fees associated with the request. *Id.*

EOUSA staff located records responsive to the request and released 40 pages of records in full, released 12 pages in part, and withheld two pages in full. *Id.* ¶ 10. In addition, agency

staff referred 65 pages of records to the FBI for its direct response to the plaintiff.  *Id.*; *see id.*,

Ex. G (Letter to the plaintiff from Marie A. O'Rourke dated December 29, 2004) at 2.[3]  The

plaintiff administratively appealed these decisions and the OIP affirmed the determinations.  *Id.* ¶

11; *see id.*, Ex. I (Letter to the plaintiff from M.A. O'Rourke dated September 12, 2008).

### E.  The Plaintiff's Requests for FBI Records

#### 1.  FOIPA No. 1000298-000

On June 18, 2004, the plaintiff made a "request[] for all records about himself . . . to the

FBI."  Plaintiff's Memorandum in Opposition to Defendant's Renewed Motion to Dismiss and to

Defendant[']s Renewed Motion for Summary Judgment, ECF No. 64 ("Pl.'s Opp'n") at 5 (page

numbers designed by the plaintiff).  Responsive records, the plaintiff believed, would have been

"located in Washington, DC, White Plains, New York, and Manhattan, New York agency

offices, possibly in relation, but not limited to [his] criminal prosecution, Case #: 02CR00099-01

(TPG) United States v. John A. Petrucelli, prosecuted within the Southern [D]istrict of New

York, which stemmed from State of New York v. Darin Mazzarella (Yonkers, NY)."

Defendant's Reply in Further Support of its Renewed Motion to Dismiss or for Summary

Judgment, ECF No. 67 ("Def.'s Reply"), Second Declaration of David M. Hardy ("Second

Hardy Decl."), Ex. A (Freedom of Information Act/Privacy Act Request dated June 18, 2004).

The FBI acknowledged receipt of the request, which was designated FOIPA No. 1000298-000.

*See* Pl.'s Opp'n, Ex. 3 (Letter to the plaintiff from David M. Hardy, Section Chief,

Record/Information Dissemination Section, Records Management Division, FBI, dated July 1,

---

[3]   The EOUSA stated in error that 75 pages of records were referred to the FBI, and it was later
determined that "in fact only 65 pages had been referred."  Def.'s First Mem., Luczynski Decl.
¶ 11.

2004).  On September 7, 2004, the plaintiff submitted another request for the same information, *see* Second Hardy Decl. ¶ 8, noting that responsive records were "believed to be located at Agency Headquarters and in the Southern District of New York agency offices," pertaining to his own criminal case or the case of Darin Mazzarella, *id*., Ex. C (Freedom of Information Act/Privacy Act Request dated September 7, 2004).  It does not appear that the FBI assigned the September 7, 2004 request a tracking number or that it conducted a separate search in response to it.[4]

The FBI denied the plaintiff's June 18, 2004 request in its entirety, *see id.* ¶ 9, relying on FOIA Exemptions 7(A) and 7(C), *id*., Ex. D (Letter to the plaintiff from D.M. Hardy dated September 29, 2004).  This determination was affirmed on administrative appeal to the OIP, *see id*., Second Hardy Decl. ¶¶ 10-12, on the ground that the responsive records were "protected from disclosure under [FOIA Exemption 7(A)]," *id*., Ex. G (Letter to the plaintiff from Janice Galli McLeod, Associate Director, OIP, dated December 31, 2007).

### 2.  FOIPA No. 1019355-000

The FBI reviewed 65 pages of records referred to the FBI by the EOUSA and determined that all of the records were exempt from disclosure in full under FOIA Exemptions 7(A), 7(C) and 7(D).  Def.'s First Mem., Declaration of David M. Hardy ("Hardy Decl.") ¶ 8; *see id.*, Ex. B (Letter to the plaintiff from David M. Hardy, Chief, Records/Information Dissemination Section, Records Management Division, FBI).  This determination was affirmed on administrative appeal

---

[4]   The plaintiff's September 7, 2004 request was substantially similar to the June 18, 2004 request.  Both sought information about the plaintiff, identified the plaintiff by name, aliases, Social Security number, date and place of birth, and identified the plaintiff's criminal case by case number and judicial district.  Presumably the FBI's response to the September 7, 2004 request would have been the same as its response to the June 18, 2004 request.

by the OIP. *Id.* ¶¶ 9-10; *see generally id.*, Ex. D (Letter to the plaintiff from Janice Galli McLeod, Associate Director, OIP, dated September 12, 2008) at 1.

"Upon . . . the filing of the instant complaint, the FBI conducted another review of the referred records" and determined that FOIA Exemption 7(A) "no longer applied since the investigation was no longer pending." Second Hardy Decl. ¶ 14. However, because "the information previously [protected under] FOIA Exemption []7(A) still warranted protection pursuant to other applicable FOIA exemptions," the FBI withheld all of the records "in their entirety." *Id.* ¶ 14; *see generally id.*, Ex. I (deleted page information sheets).

### 3. FOIPA No. 1150194-000

The plaintiff submitted a separate FOIA request to the FBI for "[a]ny and all records, reports, files, memos, and materials to include electronic filings that contain any information concerning [his] arrest date," purported to be January 28, 2002. Hardy Decl., Ex. E (Letter to D.M. Hardy from the plaintiff dated June 7, 2010) at 1. A search of the FBI's Central Records System initially yielded 913 pages of potentially responsive records. *Id.* ¶ 15; *see id.*, Ex. I (Letter to the plaintiff from D.M. Hardy dated January 18, 2011). On further review, the FBI determined that only 760 pages of records were actually responsive to the request, *id.* ¶ 21 n.6, and of these records, 495 pages were released in full on April 16, 2012, *id.* ¶ 21.[5] One of these records was "a report by FBI Special Agents, dated February 1, 2005, documenting the January

---

[5] The package mailed to the plaintiff on April 16, 2012, was returned to the FBI by the United States Postal Service as undeliverable, Second Hardy Decl. ¶ 15, and the FBI sent paper copies of the documents to another address provided by the plaintiff on September 27, 2012, *id.* ¶¶ 17-19. The FBI's declarant later clarified that the FBI released 499 pages of records to the plaintiff, that it withheld 242 pages in full, and that it withheld 19 pages in full as duplicates. *Id.* ¶ 20.

31, 2002 arrest of [the plaintiff]." *Id.* ¶ 22; *see id.*, Ex. P. "Of the remaining 265 pages, 246

were withheld in full pursuant to [FOIA Exemptions 3, 5, 6, 7(C), 7(D), 7(E), and 7(F),] and 19

pages were withheld in full as duplicates." *Id.* ¶ 21; *see id.*, Ex. O (Letter to the plaintiff from

D.M. Hardy dated April 16, 2012).

## II. DISCUSSION

### A. The Plaintiff's Privacy Act Claims

Notwithstanding the filing of the plaintiff's amended complaint, it is not clear that he has

abandoned the Privacy Act claims raised in the original complaint, particularly his claims against

the BOP under the amendment, accuracy and damages provisions of the Privacy Act. [6] *See*

Compl. at 2. The plaintiff's Request for Administrative Remedy asked, "[i]n accordance with

. . . 5 USC § 552a(d) . . . for [his] records to be amended showing actual arrest, incarceration at

MDC Brooklyn being Jan[uary] 28, 2002." Johnson Decl., Ex. B. He also demanded that the

BOP "[m]aintain all records accurately." *Id.* Lastly, the plaintiff demanded a declaratory

judgment that the BOP is "liable for using erroneous information to make determinations adverse

to [him] in three separate court proceedings in violation of sections (e)(5)[,] (g)(1)(c) and (g)(4)

of the [P]rivacy [A]ct." Compl. at 2.

The defendant represents that the Inmate Central File contains records pertaining to an

inmate's arrest, and that the system of records where Inmate Central Files are maintained is

exempt from the Privacy Act's amendment, accuracy and damages provisions. *See*

---

[6] None of the plaintiff's submissions to the EOUSA or the FBI reasonably can be construed as a
request under the Privacy Act. Accordingly, the Court will deny the plaintiff's demand for a
declaratory judgment holding the "EOUSA and FBI liable for using erroneous information to
make determinations adverse to [him] in three separate court proceedings." Am. Compl. at 4.

Memorandum of Points and Authorities in Support of Defendant's Renewed Motion to Dismiss or, Alternatively, for Summary Judgment [ECF No. 40] ("Def.'s Renewed Mem.") at 12; Defendant's Statement of Material Facts To Which There Is No Genuine Dispute ¶¶ 1-2.  The plaintiff deems the defendant's "brief . . . particularly confusing . . . where [it] argues that various records systems are exempt under the Privacy Act."  Pl.'s Opp'n at 23-24.  He argues instead that he made his requests for information under the Privacy Act as well as the FOIA, and the applicability of the Privacy Act does not "exempt [any information] from release under the FOIA, except insofar as [the information] fall[s] under one of the seven FOIA exemptions."  *Id*. at 24; *see id*. at 4 n.7.  The plaintiff, however, does not respond substantively to the defendant's argument that information contained in the Inmate Central File is exempt from the Privacy Act's amendment, accuracy and damages provisions.  He has thus conceded this point, *see, e.g., Maydak v. DOJ*, 579 F. Supp. 2d 105, 107 (D.D.C. 2008), and the Court therefore will grant the defendant's motion to dismiss the plaintiff's Privacy Act claims.

### B.  The Plaintiff's FOIA Claims

#### 1.  Summary Judgment Standard of Review in a FOIA Case

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  Courts will grant summary judgment to an agency as the movant if it shows that there is no genuine dispute as to any material fact and if the agency is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  More specifically, in a FOIA action to compel production of agency records, the agency "is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is

wholly exempt from the [FOIA's] inspection requirements.'" *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)).

Summary judgment in a FOIA case may be based solely on information provided in an agency's supporting affidavits or declarations if they are "relatively detailed and non-conclusory," *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotations and citations omitted), and when they

> [d]escribe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record [or] by evidence of agency bad faith.

*Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). "To successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with 'specific facts' demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld extant agency records." *Span v. DOJ*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting *DOJ v. Tax Analysts*, 492 U.S. 136, 142 (1989)).

2. The Agencies' Searches for Responsive Records[7]

---

[7] "The FOIA requires every federal agency, upon request, to make promptly available to any person any records so long as the request reasonably describes such records." *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003) (internal quotation marks and citation omitted). If an agency withholds information, it may do so "only if the information falls within one of nine statutory exemptions," and the agency "bears the burden of establishing than an exemption applies." *People for the Ethical Treatment of Animals v. Nat'l Inst. of Health*, 745 F.3d 535,540 (D.C. Cir. 2014) (citations omitted). Here, the plaintiff does not challenge the adequacy of the BOP's search for records responsive to his FOIA requests, nor does he object to the BOP's decisions to withhold information under FOIA Exemptions 6, 7(C), and 7(F). He "believes" that the BOP "released all maintained records," Pl.'s Opp'n at 1, and now demands (Continued . . .)

### a. EOUSA

"The 'LIONS' system is the computer system used by United States Attorneys offices to track cases and to retrieve files pertaining to cases and investigations." Luczynski Decl. ¶ 13. Through LIONS, "the user can access databases which can be used to retrieve . . . information based on a defendant's name, the USAO number (United States[] Attorney's Office internal administrative number), and the district court case number." *Id.* "Each United States Attorney's Office maintains the case files for criminal matters prosecuted by that office." *Id.*

The plaintiff identified himself and his criminal case by number and judicial district in each of his two FOIA requests to the EOUSA. *See id.*, Ex. A and F. "Upon receiving the [plaintiff's] request," the EOUSA "forwarded the request to the FOIA Contact for the Southern District of New York." *Id.* ¶ 13. "The FOIA Contact" searched "for records on 'John A. Petrucelli' to determine the location of any and all files relating to [the] plaintiff in order to comply with his request," and "for records from the case files in Case # 02CR00099-01, the criminal prosecution case [the] plaintiff identified in his request." Def.'s Renewed Mem., Declaration of David Luczynski [ECF No. 40-4] ("Second Luczynski Decl.") ¶ 13. The FOIA Contact not only queried LIONS, but also "sent emails to the Assistant United States Attorney in the Southern District of New York Criminal Division to ascertain whether [that office] had any responsive records." *Id.*

---

(. . . continued)
duplicate copies of all BOP records because they "were taken from him by the [BOP] and never returned," *id.*, during the course of the plaintiff's transfer from FCI Manchester to FCI Allenwood in June 2012, *id.* In other words, he does not challenge the BOP's compliance with its actual obligations under the FOIA and instead purports to impose another. The FOIA does not require an agency to replace copies of records previously released to a requester who subsequently loses them. With respect to the plaintiff's FOIA claims against the BOP, the Court will therefore grant the defendant's motion for summary judgment in part as conceded.

Because the "plaintiff's prosecution took place in the Southern District of New York, the United States Attorney's Office for the District of Columbia would not have records related to [his] prosecution." *Id.* ¶ 13. The declarant avers that "[t]here are no other records systems or locations within the EOUSA or DOJ in which other files pertaining to [the] plaintiff were maintained." *Id.* Thus, he states, "[a]ll documents responsive to [the] plaintiff's FOIA request have been located through the United States Attorney's Office for the Southern District of New York." *Id.* ¶ 14; *see* Luczynski Decl. ¶¶ 13-14.

The plaintiff counters that, notwithstanding his stated belief that responsive records might be found in the Southern District of New York ("SDNY"), "he had no possible way of knowing where they were kept," and the EOUSA improperly limited the scope of its search "to only those files kept in the SDNY." Pl.'s Opp'n at 11. The plaintiff also noted the EOUSA's failure to locate his "case file, despite the fact that the [p]laintiff mentioned [his] case number twice in each FOIA request." *Id.* at 11-12. According to the plaintiff the EOUSA thus ignored his July 18, 2004 request for the same records insofar as it stated the plaintiff's "belie[f] the records were located in both Washington, D.C. and the Southern District of New York." *Id.* at 11.

The plaintiff acknowledges that he was prosecuted in the Southern District of New York, and puts forth no valid reason to suspect that records related to his criminal case likely would be located in any other federal district. Nor is there any basis to conclude that responsive EOUSA records would have included "exculpatory materials originating from . . . the [New York] State Police." *Id.* at 13-14. Nor does the plaintiff proffer any authority for the proposition that a federal agency is obliged to consult with or to retrieve documents from a state law enforcement agency. "Adequacy and reasonableness turn not on the yield of the search, but on the 'appropriateness of the methods used to carry out the search.'" *Waldner v. U.S. Dep't of Justice*,

__ F. Supp. 2d __, __, 2013 WL 5974904, at *3 (D.D.C. Sept. 23, 2013) (citing *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)). The plaintiff's challenge pertains only to the results of the EOUSA's search, and such an assertion alone is far too weak to undermine the defendant's entitlement to summary judgment.

### b. FBI

The FBI's Central Records System ("CRS") includes "administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes," and "consists of a numerical sequence of files broken down according to subject matter." Hardy Decl. ¶ 24. The subject matter of a CRS file "may relate to an individual, organization, company, publication, activity or foreign intelligence matter (or program)." *Id*. FBI Headquarters maintains certain CRS records; FBI field offices maintain those CRS records "that are pertinent to specific field offices." *Id*. In order to search the CRS, "the FBI uses . . . the Automated Case Support System ('ACS')." *Id*.

FBI Headquarters and Field Offices access the CRS using alphabetically ordered General Indices. *Id*. ¶¶ 25-26. "The General Indices consist of index cards on various subject matters that are searched either manually or though the automated indices." *Id.* ¶ 25. There are two categories of General Indices:

> (a) A "main" entry – A "main" entry, or "main" file, carries the name corresponding with a subject of a file contained in the CRS.
>
> (b) A "reference" entry – A "reference" entry, sometimes called a "cross reference," is generally only a mere mention or reference to an individual, organization, or other subject matter, contained in a document located in another "main" file on a different subject matter.

*Id.* "Searches made in the General Indices to locate records concerning a particular subject, such as John A. Petrucelli, are made by searching the subject requested in the index." *Id.* ¶ 26.

Since 1995, FBI Headquarters, Field Offices and Legal Attaches use the ACS system, which "consolidate[s] portions of the CRS that were previously automated." *Id.* ¶ 27. "Because the CRS cannot electronically query the case files for data, such as an individual's name or [S]ocial [S]ecurity number, the required information is duplicated and moved to the ACS so that it can be searched." *Id.* "ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases." *Id.* ¶ 28. The Investigative Case Management application "provides the ability to open, assign, and close investigative and administrative cases [and to] set, assign, and track leads." *Id.* ¶ 28(a). Each new case is assigned a Universal Case File Number, "which is utilized by all FBI field offices . . . and FBI [Headquarters] . . . conducting or assisting in the investigation." *Id.* The Electronic Case File application "serves as the . . . electronic repository for the FBI's official text-based documents." *Id.* ¶ 28(b). The Universal Index application provides "a complete subject/case index to all investigative and administrative cases." *Id.* ¶ 28(c). The FBI does not index every name in its files; an FBI Special Agent assigned to an investigation decides which information is "pertinent, relevant, or essential for future retrieval," and indexes the information accordingly. *Id.* ¶ 29. Without an index "to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved," and the agency's files "would thus be merely archival in nature." *Id.* "[T]he General Indices to the CRS are the means by which the FBI can determine what retrievable information, if any, [it] may have in its CRS files on a particular subject matter," such as the plaintiff. *Id.*

Electronic surveillance indices ("ELSUR") "maintain information on a subject whose electronic and/or voice communications have been intercepted as a result of a consensual electronic surveillance and/or a court-ordered (and/or sought) electronic surveillance conducted by the FBI." *Id.* ¶ 30. "The ELSUR indices are a separate system of records from the CRS," *id.*, and "include individuals who were the (a) targets of direct surveillance, (b) participants in monitored conversations, and (c) owners, leasers, or licensors of the premises where the FBI conducted electronic surveillance," *id.* ¶ 31. Both FBI Headquarters and FBI field offices maintain ELSUR indices. *Id.* ¶¶ 30, 33.

In response to the plaintiff's June 7, 2010 request, using the plaintiff's name and variations of his name as search terms, FBI staff "conducted a search of the automated indices to the CRS to identify all potentially responsive main FBI Headquarters files indexed to John A. Petrucelli." Hardy Decl. ¶ 35. In addition to any main FBI Headquarters files indexed to the plaintiff's name, this search would have "identified any file indexed under [the] plaintiff's name, including both main and/or cross-references, as well as any potentially responsive file from any FBI field office." Second Hardy Decl. ¶ 22. The search identified two New York Field Office files. *Id.*; *see* Hardy Decl. ¶ 35. A search of the FBI's ELSUR Indices, using the plaintiff's name, variations of the plaintiff's name, his date of birth, Social Security Number and FBI number as search terms, yielded no responsive records. Hardy Decl. ¶ 36.

According to the FBI's declarant, the CRS search in response to the plaintiff's June 18, 2004 request "was completed using the same search parameters," yielding "files 281A-NY-25430 and 281A-NY-269024." Second Hardy Decl. ¶ 23. Both files contained "various sub-files that were also processed for [the] plaintiff," and were indeed "the same ones located in the search conducted in 2010." *Id.* Where responsive records "were from multi-subject

investigative files[,] only the portions of the files that pertained exclusively to [the plaintiff] were considered for processing." *Id.* ¶ 24. "Records pertaining to other subjects of the file were not considered responsive to [the] plaintiff's request." *Id.* ¶ 25.

The plaintiff challenges both the scope and the outcome of the FBI's searches for responsive records. He opines that "[t]he FBI's file should be at least five thousand pages long," Pl.'s Opp'n at 3, and finds it "inconceivable that only 500 pages of records exist for this case," *id.* at 1, particularly in light of the "seven-year investigation and prosecution under RICO [for] the murder of Paul Cicero," *id.*, and the involvement of "numerous alleged co-conspirators," *id.* at 3. In addition, he objects to the FBI's decision to limit its searches to records maintained in New York, notwithstanding his belief that records also may have been located in Washington, D.C. *Id.* at 11.

The FBI's failure to produce particular documents, or the plaintiff's "mere speculation that as yet uncovered documents might exist, does not undermine" the adequacy of the searches. *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004) (per curiam). The declarant explains that the CRS searches would have located not only FBI Headquarters files indexed to the plaintiff's name, but also any other file indexed to the plaintiff's name, including "main and/or cross-references, as well as any potentially responsive file from any [FBI] field office." Second Hardy Decl. ¶ 22. The Court concludes that the searches conducted by the FBI were reasonable under the circumstances of this case.

3. FOIA Exemptions[8]

a. Exemption 5

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorand[a] or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "[T]he parameters of Exemption 5 are determined by reference to the protections available to litigants in civil discovery; if material is not available in discovery, it may be withheld from FOIA requesters." *Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 516 (D.C. Cir. 1996) (internal quotation marks omitted); *see NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148 (1975). This exemption "is interpreted to encompass . . . three evidentiary privileges: the deliberative process privilege, the attorney-client privilege, and the attorney work product privilege." *Tax Analysts v. IRS*, 294 F.3d 71, 76 (D.C. Cir. 2002); *see Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Educ.*, 905 F. Supp. 2d 161, 173 (D.D.C. 2012) (citations omitted).

*i.* The Deliberative Process Privilege

The deliberative process privilege "shields only government 'materials which are both predecisional and deliberative.'" *Tax Analysts v. IRS*, 117 F.3d 607, 616 (D.C. Cir. 1997) (quoting *Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (en

---

[8]   Both the EOUSA and the FBI withhold grand jury information under FOIA Exemption 3 in conjunction with Federal Rule of Criminal Procedure 6(e). *See* Second Luczynski Decl. ¶¶ 18-20; Hardy Decl. ¶ 45. These DOJ components also withhold information obtained pursuant to wiretaps as is permissible under 18 U.S.C. §§ 2510-2520. *See* Second Luczynski Decl. ¶ 21; Hardy Decl. ¶¶ 46-47. The plaintiff nowhere in his filings mentions FOIA Exemption 3 or the defendants' legal arguments for withholding the grand jury and wiretap information found in the responsive records. As to these grounds for withholding responsive documents, the Court therefore will grant in part the defendant's summary judgment motion as conceded.

banc)). "To show that a document is predecisional, the agency need not identify a specific final agency decision; it is sufficient to establish 'what deliberative process is involved, and the role played by the documents at issue in the course of that process.'" *Heggestad v. DOJ*, 182 F. Supp. 2d 1, 7 (D.D.C. 2000) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980)). A document is "deliberative" if "it makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975). The deliberative process privilege is thought to "prevent injury to the quality of agency decisions." *Sears, Roebuck*, 421 U.S. at 151. Such protection is designed to encourage frank discussion of policy matters, prevent premature disclosure of proposed policies, and avoid public confusion that may result from disclosure of rationales that were not ultimately grounds for agency action. *See, e.g., Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982).

### *ii.* The Attorney Work Product Privilege

"The work-product doctrine shields materials 'prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative.'" *Judicial Watch, Inc. v. DOJ*, 432 F.3d 366, 369 (D.C. Cir. 2005) (quoting Fed. R. Civ. P. 26(b)(3)); *see Hickman v. Taylor*, 329 U.S. 495 (1947). Records may be withheld as attorney work product if they contain the "mental impressions, conclusions, opinions or legal theories of a party's attorney" and were "prepared in anticipation of litigation." Fed. R. Civ. P. 26(b)(3)(B); *see Miller v. DOJ*, 562 F. Supp. 2d 82, 115 (D.D.C. 2008) (concluding that documents which "reflect such matters as trial preparation, trial strategy, interpretation, personal evaluations and opinions pertinent to [a plaintiff's] criminal case" qualify as attorney work product under FOIA Exemption 5); *Heggestad*, 182 F. Supp. 2d at 8 (stating that the attorney work product privilege "covers factual

materials prepared in anticipation of litigation, as well as mental impressions, conclusions, opinions, and legal theories").

Both the deliberative process privilege and the attorney work product privilege may apply to the same information. *See, e.g., Miller*, 562 F. Supp. 2d at 114-15 (concluding that draft grand jury indictment, trial attorney certification and draft affidavit supporting a request for the plaintiff's extradition were protected under Exemption 5 insofar as they reflected "predecisional communications among government personnel such as discussions of various litigation issues, alternatives, and strategies," and "such matters as trial preparation, trial strategy, interpretation, personal evaluations and opinions pertinent to [the plaintiff's] criminal case"); *Heggestad*, 182 F. Supp. 2d at 8-12 (concluding that prosecution memoranda prepared by attorneys to assist their superiors in determining whether to authorize prosecution of the targets of a criminal investigation prior to the final decision to prosecute properly were withheld under Exemption 5).

The FBI "cite[s] the deliberative process privilege" as the basis for withholding in full an eight-page document, which the declarant describes as containing "a break down of the investigative steps used during the investigation of [the] plaintiff, and [which] was gathered and used by the prosecution prior to the trial of [the] plaintiff." Hardy Decl. ¶ 51. The EOUSA relies on both the deliberative process privilege and the attorney work product privilege, *see* Luczynski Decl. ¶¶ 20-24; Second Luczynski Decl. ¶¶ 22-26, to protect records or portions of records identified as "drafts of an indictment, emails between attorneys, drafts of a prosecutorial memorandum, and . . . pages . . . [hand]written by attorneys preparing the case." Second Luczynski Decl. ¶ 26. Its declarant states "[t]he records or portions of records" at issue "include information related to trial preparation, trial strategy, interpretations, and personal evaluations and opinions pertinent to [the] plaintiff's criminal case," as well as "deliberations concerning

asset forfeiture decisions [and] possible strategies as they relate to the case." *Id.* ¶ 24. "[I]n certain instances," the declarant explains, the records "contain the deliberative process of the United States Attorney's Office and other federal and state agencies in their consideration of possible criminal actions against [the] plaintiff." *Id.* ¶ 25. The records not only were "prepared by, or at the request or direction of an attorney, . . . in anticipation of, or during litigation," *id.* ¶ 24, but also included "pre-decisional communications among government personnel such as discussions of various litigation issues, alternatives, and strategies," *id.* ¶ 25. Thus, the declarant asserts, "[t]he attorney work product and deliberative process are so interwoven as to make . . . all [of the information], in essence, attorney work product." *Id.* ¶ 25.

The plaintiff counters that "[t]he files of the EOUSA are not all attorney work product or all attorney-client communications." Pl.'s Opp'n at 21. Rather, he argues, because these files "should contain voluminous materials from the FBI and NY State Police," they "are law enforcement records and not prepared under the direction of an attorney." *Id.* He contends, therefore, that FOIA Exemption 7, not FOIA Exemption 5, should apply. *Id.* Further, the plaintiff asserts that the records should be processed under FOIA Exemption 7, analyzed for privilege, and any "[w]ithheld records should be accounted for in a privilege log, which in this context becomes part of the [d]efendant's *Vaughn* Index." *Id.* The Court rejects the plaintiff's arguments for the following reasons.

The plaintiff merely speculates as to the content of records maintained by the EOUSA. The declarant does not indicate that the EOUSA acquired records originating with the New York State Police. Moreover, insofar as the EOUSA's records included records originating with the FBI, the declarant explains that these records had been referred to the FBI. *See* Luczynski Decl. ¶¶ 10-11; Second Luczynski Decl. ¶ 10. The plaintiff fails to demonstrate that the records or

portions of records withheld under FOIA Exemption 5 are law enforcement records to which

FOIA Exemption 7 applies, or that these DOJ components are obligated to account for privileged

material by any means other than through their supporting declarations.  "The function of

a *Vaughn* index is essentially to 'enable[] the adversary system to operate by giving the requester

as much information as possible, on the basis of which he can present his case to the trial court.'"

*Coleman v. FBI*, 972 F. Supp. 5, 7 (D.D.C. 1997) (alteration in original) (quoting *Keys v.*

*DOJ*, 830 F.2d 337, 349 (D.C. Cir. 1987)).  The focus is on the function of the *Vaughn* index, not

its format, *see Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006), and documents

need not be Bates-stamped or otherwise numbered, *see Brown v. DOJ*, 734 F. Supp. 2d 99, 104

(D.D.C. 2010).  So long as the agency's supporting declaration "provide[s] a relatively detailed

justification, specifically identif[ying] the reasons why a particular exemption is relevant and

correlat[ing] those claims with the particular part of a withheld document to which they apply,"

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force,* 566 F.2d 242, 251 (D.C. Cir. 1977), a separate

*Vaughn* index is not required.

## b.  Exemption 7

### *i*.  Law Enforcement Records

FOIA Exemption 7 protects from disclosure "records or information compiled for law

enforcement purposes," but only to the extent that disclosure would cause an enumerated harm.

5 U.S.C. § 552(b)(7); *see FBI v. Abramson*, 456 U.S. 615, 622 (1982).  "To show that . . .

documents were compiled for law enforcement purposes, the [agency] need only establish a

rational nexus between [an] investigation and one of the agency's law enforcement duties and a

connection between an individual or incident and a possible security risk or violation of federal

law." *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (internal quotation marks and citations omitted).

The EOUSA's declarant asserts that its responsive records were "compiled for law enforcement purposes – namely, to facilitate the investigation and criminal prosecution of the [plaintiff]." Luczynski Decl. ¶ 25; Second Luczynski Decl. ¶ 27. The FBI's declarant avers that "[d]ocuments responsive to [the] plaintiff's request relate to the FBI's investigation of [the] plaintiff related to organized crime activity and murder, . . . racketeering activity and murder/kidnapping (murder in aid of racketeering)." Hardy Decl. ¶ 53. The declarants adequately establish, and the plaintiff does not dispute, that the responsive records at issue in this case were compiled for law enforcement purposes within the scope of FOIA Exemption 7.

*ii.* Exemption 7(C)[9]

FOIA Exemption 7(C) protects from disclosure information in law enforcement records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). In determining whether this exemption applies to particular information, the Court must balance the interest in privacy of individuals mentioned in the records against the public interest in disclosure. *See ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011). The privacy interest at stake belongs to the individual, not the government agency, *see DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-65 (1989), and "individuals have a strong

---

[9] The FBI generally asserts FOIA Exemption 6 in conjunction with FOIA Exemption 7(C) when withholding information that could reasonably be expected to constitute an unwarranted invasion of the personal privacy of third parties. Hardy Decl. ¶ 54 n.16. The Court finds that the information identified as protected by these two exemptions is protected under FOIA Exemption 7(C) alone, and it therefore need not consider FOIA Exemption 6 separately with respect to the same information. *See Roth v. DOJ*, 642 F.3d 1161, 1173 (D.C. Cir. 2011).

interest in not being associated unwarrantedly with alleged criminal activity," *Stern v. FBI*, 737 F.2d 84, 91-92 (D.C. Cir. 1984).  When balancing an individual's privacy interest against the public interest in disclosure, "the only public interest relevant for purposes of Exemption 7(C) is one that focuses on 'the citizens' right to be informed about what their government is up to.'" *Davis v. DOJ*, 968 F.2d 1276, 1282 (D.C. Cir. 1992) (quoting *Reporters Comm.*, 489 U.S. at 773).  It is a FOIA requester's obligation to articulate a public interest sufficient to outweigh an individual's privacy interest, and the public interest must be significant.  *See Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 172 (2004).

Law Enforcement Personnel

Under FOIA Exemption 7(C), the EOUSA withholds "the identit[ies] of third party individuals, such as . . . law enforcement personnel."  Second Luczynski Decl. ¶ 28.  Its declarant explains that disclosure of such information "could subject [them] to an unwarranted invasion of their personal privacy."  *Id*.  He further explains that "[r]elease of such personal identifiers could result in . . . efforts to gain further access to [these third parties] or to personal information about them – or subject them to harassment, harm, or exposure to unwanted and/or derogatory publicity and inferences – all to their detriment."  *Id*.  The EOUSA could not identify a "countervailing public interest in the release of this privacy-protected information, because its dissemination would not help explain government activities and operations nor did the public's interest in the disclosure of this information outweigh the third-party individuals' privacy rights in the information withheld."  *Id*. ¶ 29.

Similarly, the FBI withholds the names of and identifying information about "FBI [Special Agents]. . . responsible for conducting, supervising, and/or maintaining the investigative

activities reported in the documents responsive to [the] plaintiff's request," Hardy Decl. ¶ 58, as well as the same information concerning "state and/or local law enforcement employees," *id*. ¶ 63. Its declarant explains that Special Agents "conduct official inquiries into violations of various criminal statutes and national security cases." *Id*. ¶ 59. In the performance of their duties, such as conducting searches and making arrests, the agents "come into contact with all strata of society" and create "serious disturbances to people and their lives." *Id*. "It is possible," the declarant states, that "an individual targeted by such law enforcement actions [might] carry a grudge which may last for years, and . . . seek revenge on the agents involved in a particular investigation." *Id*. Thus, any publicity resulting from the release of agents' identities "in connection with a particular investigation could trigger hostility toward" those "agent[s]." *Id*. Moreover, publicity "regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations." *Id*. ¶ 58. Accordingly, the declarant states, "disclosure of this information . . . could reasonably be expected to constitute an unwarranted invasion of their personal privacy." *Id*. ¶ 59.

The FBI applies a similar rationale for its decision to withhold the names of and identifying information about "state and/or local law enforcement employees," including members of the New York Police Department and the Yonkers Police Department. *Id*. ¶ 63. The declarant explains that "[t]hese employees were acting in their official capacities and aided the FBI in its law enforcement efforts," and that disclosure of their identities "could subject them . . . to unofficial inquiries not anticipated in connection with their assistance to the FBI." *Id*. The FBI identifies no public interest to be served if their identities were disclosed. *See id*. ¶¶ 59-60.

The plaintiff's first challenge pertains to the privacy interests of these law enforcement officers. Citing *Butler v. DOJ*, No. 86-2255, 1994 WL 55621 (D.D.C. Feb. 3, 1994), the plaintiff

asserts that "FBI agents and other law enforcement personnel 'may not have as great a claim to privacy as that afforded ordinarily to private citizens.'" Pl.'s Opp'n at 16 (quoting *Butler*, 1994 WL 55621, at *5) (quoting *Lesar v. DOJ*, 636 F.2d 472, 487 (D.C. Cir. 1980)). Even if "Exemption 7(C) . . . protect[s] the identity of FBI agents involved in investigations when their interest in not being harassed in the performance of their official duties outweighs the public interest in disclosure," Pl.'s Opp'n at 16, the plaintiff suggests that protection is not warranted in this case, particularly where "the defendant has made bald claims, unsupported by any factual evidence, that the release of these names will subject the FBI supervisory agent to harassment," *id*. at 17 (quoting *Butler*, 1994 WL 55621, at *5) (internal quotation marks omitted).

Admittedly, there is no "blanket exemption for the names of all FBI agents in all documents." *Baez v. DOJ*, 647 F.2d 1328, 1339 (D.C. Cir. 1980) (footnote and citation omitted). However, even if these law enforcement personnel "may not have as great a claim to privacy as that afforded ordinarily to private citizens," they do not "by virtue of [their] official status . . . forgo altogether any privacy claim in matters related to official business." *Lesar*, 636 F.2d at 487. They retain "a legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment in either their official or private lives." *Id*.; *see also Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, No. 12-5223, 2014 WL 1284811, at *5 (D.C. Cir. Apr. 1, 2014) (notwithstanding the "well-publicized announcement" by the former Majority Leader of the United States House of Representatives confirming that "he had been, but was no longer, under investigation" by the FBI, he "retained a second, distinct privacy interest in the *contents* of the investigative files" sought by the requester). Accordingly, "[w]hile an individual's official position may enter the 7(C) balance, it

does not determine, of its own accord, that the privacy interest is outweighed." *Bast v. DOJ*, 665 F.2d 1251, 1254-55 (D.C. Cir. 1981) (citation omitted).

In the face of law enforcement officers' legitimate privacy interests, it is the plaintiff's burden to demonstrate the existence of a public interest that outweighs those privacy interests. *See Reporters Comm.*, 489 U.S. at 774-76. The plaintiff's personal interest in "seeking documents that should have been produced and made available to him at his criminal trial," Pl.'s Opp'n at 27, does not suffice. *See, e.g., Oguaju v. United States*, 288 F.3d 448, 450 (D.C. Cir. 2002) (finding that a requester's "personal stake in using the requested records to attack his convictions does not count in the calculation of the public interest"), *vacated and remanded,* 541 U.S. 970 (2004), *on remand,* 378 F.3d 1115 (D.C. Cir. 2004) (reaffirming prior decision), *cert. denied*, 544 U.S. 983 (2005); *Engelking v. DEA*, 119 F.3d 980, 980-81 (D.C. Cir. 1997) (per curiam) ("To the extent [the appellant] argues that he seeks exculpatory information, [his] personal need for information is immaterial to whether that information is protected from disclosure by one of the exemptions to the FOIA."); *Brown v. DOJ*, 742 F. Supp. 2d 126, 133 (D.D.C. 2010) ("Assuming that plaintiff seeks documents responsive to his request in order to challenge his conviction and/or bring to light possible government misconduct, the Court finds that plaintiff has not demonstrated that either of these reasons constitute[s] a 'significant' public interest in documents concerning [a third party]."). Nor does the plaintiff's assertion of a generic public "interest in the administration of justice," Pl.'s Opp'n at 26, suffice. *See, e.g., McCutchen v. Dep't of Health & Human Servs.*, 30 F.3d 183, 188 (D.C. Cir. 1994) ("A mere desire to review how an agency is doing its job, coupled with allegations that it is not, does not create a public interest sufficient to override the privacy interests protected by Exemption 7(C)."). Absent production by the plaintiff of "evidence that would warrant a belief by a

reasonable person that . . . Government impropriety might have occurred," *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1115 (D.C. Cir. 2007) (quoting *Favish,* 541 U.S. at 174), the plaintiff cannot demonstrate the existence of a public interest calling for the release of information pertaining to these third parties.

Here, the Court concludes that the FBI Special Agents and other law enforcement personnel mentioned in the relevant records have legitimate privacy interests sufficient to outweigh any public interest in disclosure of their names or identifying information about them. *See, e.g., Stone v. FBI*, 727 F. Supp. 662, 664-65 (D.D.C. 1990) (recognizing the privacy interests of the non-supervisory FBI Special Agents and Los Angeles Police Department officers named in the FBI's file on the assassination of Robert F. Kennedy), *aff'd per curiam*, No. 90-5065, 1990 WL 134431, at *1 (D.C. Cir. Sept. 14, 1990). The EOUSA and the FBI therefore properly withhold this information under FOIA Exemption 7(C). *See, e.g., Thompson v. DOJ*, 851 F. Supp. 2d 89, 99 (D.D.C. 2012) (protecting the names of and identifying information about FBI Special Agents and support personnel, third parties with investigative interest to the FBI, third parties merely mentioned in documents related to the FBI's criminal investigation of plaintiff, local law enforcement officers, and third parties interviewed by the FBI during the investigation); *Lasko v. DOJ*, 684 F. Supp. 2d 120, 133 (D.D.C. 2010) (protecting the identities of DEA Special Agents and state and local law enforcement officers), *aff'd per curiam*, No. 10-5068, 2010 WL 3521595, at *1 (D.C. Cir. Sept. 3, 2010); *Richardson v. DOJ*, 730 F. Supp. 2d 225, 236 (D.D.C. 2010) ("[T]he EOUSA properly [withheld] the identities of and personal information about all the third parties mentioned in the records responsive to plaintiff's FOIA request, whether or not these third parties are law enforcement officers or support personnel.").

Other Third Parties

The FBI withholds the names of and identifying information about "third parties who provided information to the FBI during the course of the investigations of [the] plaintiff." Hardy Decl. ¶ 56. The declarant explains that the FBI relies on information obtained from individuals during interviews, and in the agency's experience, such interviewees typically "fear that their identit[ies] may be exposed and, consequently, that they could be harassed, intimidated, or threatened with legal consequences, economic reprisal, or possible physical harm." *Id.* ¶ 57. The FBI addresses these fears through assurances "that their names and personally-identifying information will be held in the strictest confidence." *Id.*

In addition, the FBI withholds the names of and identifying information about "third parties . . . [who] were of investigative interest to the FBI because of their criminal activities." *Id.* ¶ 61. The declarant explains that "[d]isclosure of [their] identities could subject them to harassment, embarrassment and could cause undue public attention." *Id.* Similarly, the agency withholds information about "third parties merely mentioned in documents related to the FBI's investigation of [the] plaintiff." *Id.* ¶ 62. Such information found its way into FBI records in this case "during the course of its investigation into [the] plaintiff's possible involvement in drugs, organized crime, and murder," and its release, the declarant states, would reveal the individuals' connection to a criminal investigation, carrying with it "an extremely negative connotation." *Id.* These third parties thus would be subjected "to possible harassment or criticism" or "derogatory inferences and suspicion." *Id.*

The names of and information about FBI support personnel, *id.* ¶ 60, and "non-FBI federal government personnel," *id.* ¶ 64, are also withheld under FOIA Exemption 7(C). FBI

support personnel, the declarant explains, "were assigned to handle tasks related to the official investigation into [the] plaintiff," and "were, and possibly are, in a position to access information regarding official law enforcement investigations," and thus "could become targets of harassing inquiries for unauthorized access to investigations if their identities were released." *Id*. ¶ 60. The same rationale applies to the FBI's decision to withhold identifying information about non-FBI federal employees. *Id*. ¶ 64. In none of these circumstances does the FBI find a public interest sufficient to outweigh the privacy interests of these third parties. *Id*. ¶¶ 57, 60-62, 65.

The EOUSA withholds "the identit[ies] of third party individuals, such as potential witnesses" under FOIA Exemption 7(C). Second Luczynski Decl. ¶ 28. "Release of such personal identifiers," the declarant states, "could result in unwarranted efforts to gain further access to [them] or to personal information about them – or subject them to harassment, harm, or exposure to unwanted and/or derogatory publicity and inferences." *Id*.

The plaintiff argues that the defendant "may not withhold the names of the third parties mentioned in the documents, unless the information about them is private in nature." Pl.'s Opp'n at 16. He further asserts that "[w]itnesses expect their names and testimony to be revealed in a hearing," for example, and therefore their privacy interests do not prevail. *Id*.

"As a general rule, third-party identifying information contained in [law enforcement] records is 'categorically exempt' from disclosure." *Lazaridis v. U.S. Dep't of State*, 934 F. Supp. 2d 21, 38 (D.D.C. 2013) (quoting *Nation Magazine v. U.S. Customs Serv*., 71 F.3d 885, 896 (D.C. Cir. 1995)); *see Blackwell*, 646 F.3d at 41 ("As a result of Exemption 7(C), FOIA ordinarily does not require disclosure of law enforcement documents (or portions thereof) that contain private information."). "FOIA Exemption 7(C) takes particular note of the strong

interest of individuals, whether they be suspects, witnesses, or investigators, in not being associated unwarrantedly with alleged criminal activity." *Dunkelberger v. DOJ*, 906 F.2d 779, 781 (D.C. Cir. 1990) (internal quotation marks and citation omitted); *see also Fitzgibbon v. CIA,* 911 F.2d 755, 768 (D.C. Cir. 1990) ("It is surely beyond dispute that the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." (internal quotation marks and citation omitted)); *Stern*, 737 F.2d at 91 (recognizing that a government "employee has at least a minimal privacy interest in his or her employment history and job performance evaluations").

The plaintiff offers no support for the proposition that the third parties whose identities have been protected under FOIA Exemption 7(C) have waived their privacy interests in any way, even if any of these individuals had already testified in open court. *See, e.g., Jones v. FBI*, 41 F.3d 238, 247 (6th Cir. 1994) (rejecting the "plaintiff's argument that certain agents waived 7(C) protection by testifying at plaintiff's habeas proceeding"). And these third parties maintain an interest in their personal privacy even if the plaintiff already knows, or is able to guess, their identities. *See Weisberg v. DOJ*, 745 F.2d 1476, 1491 (D.C. Cir. 1984).

*iii.* Exemption 7(D)

FOIA Exemption 7(D) protects from disclosure those records or information compiled for law enforcement purposes that

> could reasonably be expected to disclose the identity of a confidential source . . . [who] furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation . . ., information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D). There is no general "presumption that a source is confidential within the meaning of [FOIA] Exemption 7(D) whenever [a] source provides information [to a law enforcement agency] in the course of a criminal investigation." *DOJ v. Landano*, 508 U.S. 165, 181 (1993). Rather, a source's confidentiality must be determined on a case-by-case basis. *Id*. at 179-80. "A source is confidential within the meaning of [E]xemption 7(D) if the source 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'" *Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995) (per curiam) (quoting *Landano*, 508 U.S. at 170-74).

Express Assurance of Confidentiality

Where an agency withholds information provided under an express grant of confidentiality, it "is required to come forward with probative evidence that the source did in fact receive an express grant of confidentiality." *Davin v. DOJ*, 60 F.3d 1043, 1061 (3d Cir. 1995). Such

> [p]roof could take the form of declarations from the agents who extended the express grants of confidentiality, contemporaneous documents from the FBI files reflecting the express grants of confidentiality, evidence of a consistent policy of expressly granting confidentiality to certain designated sources during the relevant time period, or other such evidence that comports with the Federal Rules of Evidence.

*Id*. Here, the FBI makes the necessary showing; however, the EOUSA does not.

The FBI has withheld "the name [of], identifying data [about] and information . . . concerning plaintiff's violent criminal activities" provided by several individuals under an express assurance of confidentiality. Hardy Decl. ¶ 71. The declarant explains that "the words 'PROTECT IDENTITY' [appear] when [each] individual's name is referenced in the file,"

which is "a positive indication of an express assurance of confidentiality." *Id.* According to the declarant, "[a]ll of the individuals would reasonably fear that disclosure of their identit[ies] would place them in danger since they provided information related to the FBI's investigation into [the] plaintiff's violent criminal activities." *Id.*

The FBI has also withheld "the informant file number of a permanent confidential symbol number source," described by the declarant as an informant who regularly provides information to the FBI under an express assurance of confidentiality and to whom a unique number is assigned. *Id.* ¶ 72. According to the FBI's declarant, "[d]isclosure of the confidential source file number[] at various times and in various documents could ultimately identify [this source by] reveal[ing] the connections [between the] confidential informant[] to the information [he or she] provided." *Id.* ¶ 73. "Repeated release[s]," according to the declarant, of a confidential source file number along with the information he or she provided would "narrow the possibilities of [his or her] true identity." *Id.*

The FBI has therefore presented "probative evidence that the source[s] did in fact receive . . . express grant[s] of confidentiality," *Davin*, 60 F.3d at 1061, and that its decision to withhold information under FOIA Exemption 7(D) is proper. *See, e.g., Roth v. DOJ*, 642 F.3d 1161, 1185 (D.C. Cir. 2011) (protecting FBI source-symbol-number informants); *Willis v. DOJ*, 581 F. Supp. 2d 57, 77 (D.D.C. 2008) (protecting source where the phrase "Protect Identity" appears after the individual's name in the responsive records).

The EOUSA also purports to withhold "information . . . provided with an express assurance of confidentiality." Second Luczynski Decl. ¶ 34. Its declarant, however, merely makes a "bald assertion that express assurances were given," proffering "little more than

recitation of the statutory standard, which [the D.C. Circuit has] held is insufficient," *Billington v. DOJ*, 233 F.3d 581, 584 (D.C. Cir. 2000). Its declaration is so lacking in detail that the Court cannot determine whether there is a valid basis to invoke FOIA Exemption 7(D) with respect to the confidential source or sources.

## Implied Assurance of Confidentiality

"When no express assurance of confidentiality exists, courts consider a number of factors to determine whether the source nonetheless spoke with an understanding that the communication would remain confidential." *Roth*, 642 F.3d at 1184 (internal quotation marks and citation omitted). The FBI has withheld "the names, identifying information, and investigative information concerning [the] plaintiff's violent criminal activities provided by third parties under an implied assurance of confidentiality." Hardy Decl. ¶ 69. Specifically, it withheld "portions of interviews where the release of the information could clearly identify the source of that information." *Id.* ¶ 70.

"The mere fact that a person . . . provides information to a law enforcement agency does not render that person a confidential source within the meaning of [FOIA Exemption] 7(D)." *Campbell v. DOJ*, 164 F.3d 20, 34 (D.C. Cir. 1998) (internal quotation marks and citation omitted). Rather, "[t]he nature of the crime . . . investigated and the source's relation to it" are factors relevant to determining whether implied confidentiality exists," *Landano*, 508 U.S. at 180. The FBI's declarant states only that "[t]he sensitivity of the information, and the position of the sources, are such that it may be inferred that the information was provided with the expectation of confidentiality," Hardy Decl. ¶ 70, without having explained adequately the connection between the plaintiff's criminal activities and the protected informant or informants

and the nature of the information provided.  The FBI has thus failed to demonstrate that it properly withheld information under FOIA Exemption 7(D) with respect to source(s) who purportedly provided information to the FBI under an implied assurance of confidentiality.

The EOUSA fares better in its application of FOIA Exemption 7(D) "to protect individuals who provided information as confidential sources during a criminal investigation (both their identit[ies] and the information provided), disclosure of which would  likely produce a disastrous impact upon the ability to ever obtain such investigative information again, as it would create a chilling effect upon the free-flow of information essential to resolve criminal prosecutions."  Luczynski Decl. ¶ 29.  In addition, the declarant states, disclosure of this information would render these informants "targets of harassment or other forms of reprisal." Second Luczynski Decl. ¶ 31.  In support of the EOUSA's position, the declarant notes that the "plaintiff was . . . convicted . . . of a retaliatory murder – a revenge killing that is connected to a racketeering enterprise where [the plaintiff's] accomplices are surely likely to continue the endeavor."  *Id*. ¶ 33.  The informants at issue, the declarant explains, "supplied information to law enforcement officers in connection with the enterprise, which is characterized as violent." *Id*.  For this reason, the declarant asserts that the informants "were interviewed under circumstances in which the assurance of confidentiality may be implied since they were reporting on fraudulent activities of an organized crime group involving plaintiff and others," and "[i]t can [also] be implied that these individuals would reasonably fear that disclosure of their identit[ies] would place them in danger."  *Id*.

The plaintiff contends that any "[i]nformation relating to informants disclosed at trial has been officially acknowledged and must be processed along with any other responsive information."  Pl.'s Opp'n at 17.  Accordingly, he argues, FOIA Exemption 7(D) does not apply

to "any informant files or documents relating to acknowledged informants and co-operating witnesses and co-defendants, such as Joseph DeFede, Michael Zanfardino, Darryn Mazzarella and Sean McKernan." *Id*. at 18. However, "once an informant's confidentiality has been established, almost nothing can eviscerate Exemption 7(D) protection." *Reiter v. DEA*, No. 96-0378, 1997 WL 470108 at *6 (D.D.C. Aug. 13, 1997), *aff'd*, No. 97-5246, 1998 WL 202247 (D.C. Cir. Mar. 3, 1998). The exemption makes no mention of waiver, and courts literally interpreting it generally have held that "once the agency receives information from a 'confidential source' during the course of a legitimate criminal investigation . . . *all* such information obtained from the confidential source receives protection." *Parker v. DOJ*, 934 F.2d 375, 380 (D.C. Cir. 1991) (citing *Lesar*, 636 F.2d at 492 & n.114). Ultimately, protection of information under FOIA Exemption 7(D) depends on whether the source spoke with confidentiality, "even after the source has been revealed to the requester or when the requester knows the source's identity." *Reiter*, 1997 WL 470108, at *6 (citations omitted); *see Moffat v. DOJ*, 716 F.3d 244, 253 (1st Cir. 2013) ("Exemption 7(D)'s shield does not necessarily disappear when some fraction of the information requested has come to light."), *cert. denied*, __ U.S. __, 134 S. Ct. 950 (2014).

Under the circumstances presented here by the EOUSA's declarant, where the plaintiff has been involved in organized crime and has been convicted of a revenge killing related to that activity, it is reasonable to conclude that the informants provided information under an implied assurance of confidentiality. *See, e.g., Miller*, 562 F. Supp. 2d at 123 (protecting interviewees who provided detailed information about activities of the requester and his associates, particularly given requester's history of kidnapping, murder and dismemberment of bodies); *Truesdale v. DOJ*, No. 03-1332, 2005 WL 3294004, at *7 (D.D.C. Dec. 5, 2005) (protecting

witnesses to drug trafficking activities of a requester who had been "convicted of engaging in a continuing criminal enterprise, a conspiracy to distribute cocaine, and firearms offenses").

*iv.* Exemption 7(E)

FOIA Exemption 7(E) protects from disclosure law enforcement records "to the extent that the production of such . . . information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions . . . if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Under FOIA Exemption 7(E), the FBI "protects procedures and techniques used by FBI agents to conduct criminal investigations." Hardy Decl. ¶ 76. According to the FBI's declarant, "[d]isclosure of this information could enable subjects of FBI investigations to circumvent similar currently used techniques and procedures by law enforcement," such that "[t]he relative benefit of these techniques and procedures could be diminished," in turn "facilitat[ing] the accumulation of information by other investigative subjects regarding the circumstances under which these techniques and procedures were used or requested and the value of the information obtained." *Id.* Contrary to the plaintiff's argument that FOIA Exemption 7(E) "doesn't exempt routine techniques and procedures already known to the public," Pl.'s Opp'n at 19, "even commonly known procedures may be protected from disclosure if the disclosure could reduce or nullify their effectiveness." *Judicial Watch v. U.S. Dep't of Commerce*, 337 F. Supp. 2d 146, 181 (D.D.C. 2004) (citations omitted). While the FBI's position may have merit, its showing is deficient due to its "near-verbatim recitation of the statutory standard." *Citizens for Responsibility & Ethics in Washington*, 2014 WL 1284811, at *13. The FBI is obligated to "at least provide *some* explanation of what procedures are involved and how they would be disclosed." *Id.* From what

has been provided, the Court neither can determine whether FOIA Exemption 7(E) applies with respect to the information withheld nor whether any reasonably segregable information can be disclosed.

*v.* Exemption 7(F)

FOIA Exemption 7(F) protects from disclosure information contained in law enforcement records that "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). "While courts generally have applied [FOIA] Exemption 7(F) to protect law enforcement personnel or other specified third parties, by its terms, the exemption is not so limited; it may be invoked to protect 'any individual' reasonably at risk of harm." *Long v. DOJ*, 450 F. Supp. 2d 42, 79 (D.D.C. 2006) (quoting 5 U.S.C. § 552(b)(7)(F)); *see Gonzalez v. Bureau of Alcohol, Tobacco, and Firearms*, No. 04-2281, 2005 WL 3201009, at *10 (D.D.C. Nov. 9, 2005) (protecting identities of undercover DEA agents); *Durham v. DOJ*, 829 F. Supp. 428, 434 (D.D.C. 1993) (protecting third parties, some of whom requested placement in Federal Witness Protection Program, with knowledge of murder the plaintiff committed). "In reviewing claims under [FOIA E]xemption 7(F), courts have inquired whether there is some nexus between disclosure and possible harm and whether the deletions were narrowly made to avert the possibility of such harm." *Antonelli v. Fed. Bureau of Prisons*, 623 F. Supp. 2d 55, 58 (D.D.C. 2009) (citing *Albuquerque Pub. Co. v. DOJ*, 726 F. Supp. 851, 858 (D.D.C. 1989)); *see Linn v. DOJ*, No. 92-1406, 1995 WL 631847, at *8 (D.D.C. Aug. 22, 1995) (noting court's inquiry as to "whether there is some nexus between disclosure and possible harm"). Within limits, the court defers to the agency's assessment of danger. *See Garcia v. DOJ*, 181 F. Supp. 2d 356, 378 (S.D.N.Y. 2002) (quoting *Linn*, 1995 WL 631847, at *9).

The FBI withholds a source's identifying information on the ground that its release would place him or her at great risk, and particularly did so here "[i]n light of both the detailed nature of the information [he or she] has provided to the FBI and the fact that [the] plaintiff is serving a life sentence for racketeering and murder/kidnapping (murder in aid of racketeering[)]." Hardy Decl. ¶ 78. This broad statement may not alone establish the requisite nexus between the disclosure of the information and any potential danger to the source. However, when coupled with the nature of the plaintiff's criminal activity – particularly his conviction of murder in furtherance of racketeering – the FBI manages to support its decision to withhold identifying information about and information provided by this source.

The EOUSA offers a somewhat muddled explanation for withholding records and portions of records under FOIA Exemption 7(F) alone and in some instances in conjunction with other exemptions, particularly FOIA Exemption 7(C). *See* Second Luczynski Decl. ¶¶ 36-37. The agency appears to withhold in full "an internal memorandum from the AUSA in the Southern District of New York," which "explained in detail [the plaintiff's] conviction for murder in aid of racketeering and imposition of a life sentence." *Id.* ¶ 36. Its declarant mentions a "closely related case . . . which also charges violent organized-crime racketeering [and] involves many of the same witnesses [and] evidence," and also mentions the fact that the plaintiff "was a target of an investigation into witness tampering and intimidation." *Id.* The EOUSA's declarant represents that "[t]he release of any records or information regarding the case could reasonably be expected to interfere with law enforcement proceedings," *id.*, but he does not clarify whether the case he is referring to is the plaintiff's case or the case of another

suspect or criminal defendant.[10]  And even if "[m]any . . . documents consist of reports of interviews of victims of crimes committed by [the plaintiff], his co-conspirators, and co-racketeers" and include "information about the victims' relatives," *id*., the declarant only states in conclusory fashion that no information can be released.  Lastly, the declaration does not distinguish clearly which withholdings have been made under FOIA Exemption 7(F) alone, and which are made "in conjunction with other exemptions, particularly [FOIA Exemption 7(C)]." *Id*. ¶ 37.  The Court therefore cannot determine based on the existing record whether the EOUSA's reliance on FOIA Exemption 7(F) is proper.

### III.  CONCLUSION AND ORDER

For the reasons set forth above, the Court concludes that the BOP conducted reasonable searches for records responsive to the plaintiff's FOIA requests, and that it properly has withheld information under FOIA Exemptions 6, 7(C), and 7(F).  In addition, the Court concludes that the EOUSA and the FBI have conducted reasonable searches for information responsive to the plaintiff's FOIA requests, and that their withholdings under FOIA Exemptions 3, 5 and 7(C) were proper.  In these respects, the Court grants summary judgment for the defendant.  However, because the EOUSA failed to justify its decisions to withhold information under FOIA Exemptions 7(D) (express grant of confidentiality) and 7(F), and because the FBI failed to adequately justify its decisions to withhold information under FOIA Exemptions 7(D) (implied assurance of confidentiality) and 7(E), the Court denies summary judgment without prejudice as to the assertion of these exemptions.  The Court defers its ruling on segregability.

---

[10]   The declarant's reference to law enforcement proceedings suggests that FOIA Exemption 7(A) may be applicable, notwithstanding a prior assertion, *see* Second Luczynski Decl. ¶ 6 & n.1, that the EOUSA no longer relies on FOIA Exemption 7(A).

Accordingly, in accordance with this Memorandum Opinion and the Order issued on March 31, 2014, it is hereby

ORDERED that the Defendant's Renewed Motion to Dismiss or, Alternatively, Motion for Summary Judgment [ECF No. 40] is GRANTED IN PART and DENIED IN PART WITHOUT PREJUDICE; it is

FURTHER ORDERED that the plaintiff's Motion for Judicial Notice [ECF No. 43], his Motion Pursuant to Rule 18 and/or 20(a) of the Federal Rules of Civil Procedure [ECF No. 46], and Plaintiff's Motion to File Sur-reply [ECF No. 69] are DENIED; and it is

FURTHER ORDERED that, within 45 days of this Order, the parties either shall submit a joint proposed schedule for further proceeding in this case, or shall file renewed dispositive motions.

SO ORDERED.

DATE: June 27, 2014                         /s/
                                            REGGIE B. WALTON
                                            United States District Judge